AO 106 (Rev. 06/09) Application for a Search Warrant

# UNITED STATES DISTRICT COURT

for the

Eastern District of Missouri

In the Matter of the Search of

TWO ELECTRONIC DEVICES (subject electronic devices), A Black Apple iPhone with a clear case; Model # Unknown; FCC ID: Unknown; IC: Unknown; IMEI: Unknown, AND A Black Apple iPhone with a no case; Model #Unknown; FCC ID: Unknown; IC: Unknown; IMEI: Unknown photographed and attached in Attachment A.

Case No.    4:25 MJ 7207 SPM

SIGNED AND SUBMITTED TO THE COURT FOR FILINGBY RELIABLE ELECTRONIC MEANS

## APPLICATION FOR A SEARCH WARRANT

I, Jaclyn Casaceli                   , a federal law enforcement officer or an attorney for the government request a search warrant and state under penalty of perjury that I have reason to believe that on the following property:

TWO ELECTRONIC DEVICES (subject electronic devices), A Black Apple iPhone with a clear case; Model # Unknown; FCC ID: Unknown; IC: Unknown; IMEI: Unknown, AND A Black Apple iPhone with a no case; Model #Unknown; FCC ID: Unknown; IC: Unknown; IMEI: Unknown photographed and attached in Attachment A

located in the        EASTERN        District of        MISSOURI        , there is now concealed

### SEE ATTACHMENT B

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☑ evidence of a crime;

☑ contraband, fruits of crime, or other items illegally possessed;

☑ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| Title 21, U.S.C. 841, 846 | conspiracy to distribute and possession with the intent to |
| Title 18, U.S.C. 1956 | distribute controlled substances; money laundering |

The application is based on these facts:

### SEE ATTACHED AFFIDAVIT WHICH IS INCORPORATED HEREIN BY REFERENCE

☑ Continued on the attached sheet.

☐ Delayed notice of        days (give exact ending date if more than 30 days:              ) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

I state under penalty of perjury that the foregoing is true and correct.

*Applicant's signature*

Jaclyn Casaceli, Special Agent, DEA

*Printed name and title*

Sworn, to, attested to, and affirmed before me via reliable electronic means pursuant to Federal Rules of Criminal Procedure 4.1 and 41.

Date:        7/30/2025

*Judge's signature*

City and state:  St. Louis, MO

Honorable Shirley P. Mensah, U.S. Magistrate Judge

*Printed name and title*

AUSA:  Angie Danis

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI

IN THE MATTER OF THE SEARCH OF )
THE SUBJECT ELECTRONIC DEVICES )   No. 4:25 MJ 7207 SPM
MORE SPECIFICALLY DESCRIBED IN )
ATTACHMENT A. )
                                    )   **FILED UNDER SEAL**
                                    )
                                    ) SIGNED AND SUBMITTED TO THE COURT FOR FILING
                                    ) BY RELIABLE ELECTRONIC MEANS

## AFFIDAVIT IN SUPPORT OF AN APPLICATION UNDER RULE 41 FOR A SEARCH WARRANT

I, Jaclyn Casaceli, being first duly sworn via reliable electronic means, hereby depose and state as follows:

### INTRODUCTION AND AGENT BACKGROUND

1.    I make this affidavit in support of an application under Rule 41 of the Federal Rules of Criminal Procedure for a search warrant authorizing the examination of property – two (2) electronic devices – described in Attachment A, which are currently in law enforcement possession, and the extraction from that property of electronically stored information described in Attachment B.

2.    I am a Special Agent (SA) with the Drug Enforcement Administration (DEA), United States Department of Justice, and I am currently assigned to the St. Louis Division Office (SLDO). I have been employed by the DEA since June 2018, during which time I have specialized in investigations involving narcotics trafficking. Prior to my assignment with the DEA, I was a Police Officer with the Cranston, Rhode Island Police Department for approximately two years and a Police Officer with the Middletown, Rhode Island Police Department for approximately three years. Upon joining the DEA, I completed 16 weeks of training in drug investigations and related legal matters at the DEA's Training Academy in Quantico, Virginia. Coursework at the

Training Academy included Drug Identification, Undercover Techniques, Tactical Training, Interview and Interrogation Techniques, and Legal Instruction. Since then, I have received additional training in Cyber Investigations, Cryptocurrency tracing and Undercover Techniques. While at the DEA, I have also personally participated in multiple narcotics investigations.

3.      Through my training and experience, I am familiar with the way in which narcotic traffickers conduct their business, including, but not limited to: the types and amounts of drugs distributed; the types and amounts of profits made; the methods of importing and distributing controlled substances; the use of mobile telephones, email accounts, and the Internet to facilitate their transactions; and the use of numerical codes and code words to conduct their dealings. I have participated in investigations that have led to the issuance of search warrants involving violations of narcotic laws. These warrants involved the search of locations including: residences of targets, their associates and relatives, "stash houses" (houses used as drug/money storage locations), storage facilities, cellular/camera phones, and computers. Evidence, searched for, and recovered in these locations has included controlled substances, records pertaining to the expenditures and profits realized there from, monetary instruments and various assets that were purchased with the proceeds of the drug trafficking. I have participated in the execution of multiple federal search warrants.

4.      The facts in this affidavit come from my personal observations, my training and experience, and information obtained from other agents and witnesses. This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

2

5.      Based on my training and experience and the facts as set forth in this affidavit, there is probable cause to believe that violations of Title 18, United States Code, Section 1956 and Title 21, United States Code, Sections 841(a) and 846 have been committed by Marvell LLOYD (LLOYD) and other persons known and unknown. There is also probable cause to search the information described in Attachment A for evidence of these crimes and contraband or fruits of these crimes, as described in Attachment B.

### LOCATION TO BE SEARCHED AND IDENTIFICATION OF THE DEVICE

6.      The information contained in this Affidavit is submitted for the sole purpose of demonstrating probable cause exists to search the following electronic devices (hereinafter collectively referred to as the "**subject electronic devices**"), described below and depicted in Attachment A:

   a.   **Device #1:**    Black Apple iPhone with a clear case; Model # Unknown; FCC ID: Unknown; IC: Unknown; IMEI: Unknown; photographed and included in Attachment A.

   b.   **Device #2:**    Black Apple iPhone with a no case; Model #Unknown; FCC ID: Unknown; IC: Unknown; IMEI: Unknown; photographed and included in Attachment A.

7.      Following their seizure, as described below, the **subject electronic devices** were transported to and stored securely in the St. Louis Gateway Strike Force electronic evidence lockers located within the city of Maryland Heights, in the Eastern District of Missouri.  They have not been examined or altered in any way since their seizure.

3

8.      The applied-for warrant would authorize the forensic examination of the **subject electronic devices** for the purpose of identifying electronically stored data particularly described in Attachment B.

## TECHNICAL TERMS

9.      Based on my training and experience, I use the following technical terms to convey the following meanings:

    a.   Wireless telephone: A wireless telephone (or mobile telephone, or cellular telephone) is a handheld wireless device used for voice and data communication through radio signals. These telephones send signals through networks of transmitter/receivers, enabling communication with other wireless telephones or traditional "land line" telephones. A wireless telephone usually contains a "call log," which records the telephone number, date, and time of calls made to and from the phone. In addition to enabling voice communications, wireless telephones offer a broad range of capabilities. These capabilities include: storing names and phone numbers in electronic "address books;" sending, receiving, and storing text messages and e-mail; taking, sending, receiving, and storing still photographs and moving video; storing and playing back audio files; storing dates, appointments, and other information on personal calendars; and accessing and downloading information from the Internet. Wireless telephones may also include global positioning system ("GPS") technology for determining the location of the device.

    b.   Digital camera: A digital camera is a camera that records pictures as digital picture files, rather than by using photographic film. Digital cameras use a variety of fixed

4

and removable storage media to store their recorded images. Images can usually be retrieved by connecting the camera to a computer or by connecting the removable storage medium to a separate reader. Removable storage media include various types of flash memory cards or miniature hard drives. Most digital cameras also include a screen for viewing the stored images. This storage media can contain any digital data, including data unrelated to photographs or videos.

c. Portable media player: A portable media player (or "MP3 Player" or iPod) is a handheld digital storage device designed primarily to store and play audio, video, or photographic files. However, a portable media player can also store other digital data. Some portable media players can use removable storage media. Removable storage media include various types of flash memory cards or miniature hard drives. This removable storage media can also store any digital data. Depending on the model, a portable media player may have the ability to store very large amounts of electronic data and may offer additional features such as a calendar, contact list, clock, or games.

d. GPS: A GPS navigation device uses the Global Positioning System to display its current location. It often contains records the locations where it has been. Some GPS navigation devices can give a user driving or walking directions to another location. These devices can contain records of the addresses or locations involved in such navigation. The Global Positioning System (generally abbreviated "GPS") consists of 24 NAVSTAR satellites orbiting the Earth. Each satellite contains an extremely accurate clock. Each satellite repeatedly transmits by radio a

5

mathematical representation of the current time, combined with a special sequence of numbers. These signals are sent by radio, using specifications that are publicly available. A GPS antenna on Earth can receive those signals. When a GPS antenna receives signals from at least four satellites, a computer connected to that antenna can mathematically calculate the antenna's latitude, longitude, and sometimes altitude with a high level of precision.

e.  PDA: A personal digital assistant, or PDA, is a handheld electronic device used for storing data (such as names, addresses, appointments or notes) and utilizing computer programs. Some PDAs also function as wireless communication devices and are used to access the Internet and send and receive e-mail. PDAs usually include a memory card or other removable storage media for storing data and a keyboard and/or touch screen for entering data. Removable storage media include various types of flash memory cards or miniature hard drives. This removable storage media can store any digital data. Most PDAs run computer software, giving them many of the same capabilities as personal computers. For example, PDA users can work with word-processing documents, spreadsheets, and presentations. PDAs may also include global positioning system ("GPS") technology for determining the location of the device.

f.  Tablet: A tablet is a mobile computer, typically larger than a phone yet smaller than a notebook that is primarily operated by touching the screen. Tablets function as wireless communication devices and can be used to access the Internet through cellular networks, 802.11 "wi-fi" networks, or otherwise. Tablets typically contain

6

programs called apps, which, like programs on a personal computer, perform different functions and save data associated with those functions. Apps can, for example, permit accessing the Web, sending and receiving e-mail, and participating in Internet social networks.

g. Pager: A pager is a handheld wireless electronic device used to contact an individual through an alert, or a numeric or text message sent over a telecommunications network. Some pagers enable the user to send, as well as receive, text messages.

h. IP Address: An Internet Protocol address (or simply "IP address") is a unique numeric address used by computers on the Internet. An IP address is a series of four numbers, each in the range 0-255, separated by periods (e.g., 121.56.97.178). Every computer attached to the Internet computer must be assigned an IP address so that Internet traffic sent from and directed to that computer may be directed properly from its source to its destination. Most Internet service providers control a range of IP addresses. Some computers have static—that is, long-term—IP addresses, while other computers have dynamic—that is, frequently changed—IP addresses.

i. Internet: The internet is a global network of computers and other electronic devices that communicate with each other. Due to the structure of the internet, connections between devices on the internet often cross state and international borders, even when the devices communicating with each other are in the same state.

7

10.     Based on my training, experience, and research, I know that the **subject electronic devices** have capabilities that allow them to serve as wireless telephones, digital cameras, portable media players, GPS navigation devices, and PDAs. In my training and experience, examining data stored on these types of devices can uncover, among other things, evidence that reveals or suggests who possessed or used the **subject electronic devices**.

## INVESTIGATION AND PROBABLE CAUSE

### A.     Background of Investigation

11.     Federal law enforcement agencies -- including the DEA, the Bureau of Alcohol, Tobacco, Firearms and Explosives, and the Internal Revenue Service -- are investigating a drug trafficking organization (DTO) distribution of illegal drugs, including large quantities of cocaine and crystal methamphetamine, across the United States. As discussed below, MAJEAU is believed to be a leader of this drug trafficking conspiracy. MAJEAU has been utilizing commercial shipping entities including the United Parcel Service ("UPS") to distribute drugs across the United States as well as receive drug proceeds. Participants in the DTO include MAJEAU, LLOYD, ORLANDO, HERNANDEZ and others known and unknown to distribute large quantities of illegal drugs. As set forth herein, law enforcement believes evidence, fruits, and instrumentalities of violations of the Subject Offenses will be found on the subject electronic devices.

### B.     UPS Parcel Seizures in Missouri, Ohio, Maryland and Connecticut Containing Cocaine and Methamphetamine

12.     In October and December 2023, DEA St Louis investigators, along with Maryland State Police and the Cuyahoga County, Ohio Sheriff's Department, seized six (6) UPS parcels containing a total of approximately 33 kilograms of a white powdery substance, which lab tested

8

positive for cocaine, shipped to addresses in the greater St. Louis, Missouri area, Ohio and Maryland. The kilograms of cocaine were all packaged similarly, secured in the parcels with hardened spray foam and black paper, and contained prepaid UPS shipping labels with destination addresses associated with businesses in Commerce, California. In addition, DEA St. Louis investigators seized two (2) UPS parcels containing a total of 22 pounds of a crystal-like substance, which lab tested positive for methamphetamine. The parcels were shipped using UPS shipper accounts 5W07W5 and C4816C. Pursuant to a subpoena, UPS advised investigators that the shipper addresses from the seized parcels and the destination addresses from the prepaid return labels found in the cocaine parcels were along the permanent route of one UPS driver, Eric HERNANDEZ.

13.    In August 2024, DEA St Louis investigators, along with DEA Hartford investigators, seized two (2) UPS parcels containing a total of approximately 10 kilograms of a white powdery substance, which lab tested positive for cocaine, shipped to addresses in the greater St. Louis, Missouri area, and Connecticut. The kilograms of cocaine were all packaged similarly to the cocaine parcels discussed in the preceding paragraph.

14.    Drug traffickers will use several different techniques to send or receive drug proceeds and payments from customers for narcotics. One technique commonly used by drug traffickers is the shipment of cash utilizing the United States Postal Service (USPS) or commercial shipping companies, such as UPS and FedEx. Investigators believe the labels contained within the cocaine parcels are provided by the Drug Trafficking Organization (DTO) so they can receive payments for drugs sent to customers across the United States. The postage is prepaid, allowing customers to send payments to the DTO in a way still controlled by DTO members to avoid any

9

errors in shipment. Return postage was located in all UPS parcels containing cocaine which have been seized by law enforcement investigators since the initiation of this investigation.

15.     Drug traffickers often use the United States Postal Service or commercial express mail delivery companies, such as FedEx or UPS, to ship drugs and money throughout the United States. They do so, at least in part, because of the convenience of the service, the availability of internet and phone tracking services, the speed of delivery, and to reduce their risk of arrest during the transportation of drugs from one place to another. They often use hand-written air bills, drop the packages near closing time, pay for such services in cash or cryptocurrencies, and use fictitious names, addresses, and telephone numbers to avoid detection by law enforcement. Drug traffickers frequently keep records relating to their use of these services, such as receipts, copies of air bills and package tracking records from the internet. They may request to receive notification of deliveries or receipt of postage purchases through email or text message. By searching the SUBJECT PREMISES, agents could potentially identify additional postage purchased to ship drugs and drug proceeds across the United States. Agents could also identify if additional shipping companies have been utilized to ship drugs to customers of the Drug Trafficking Organization.

**C.     Seizure of Cash Parcels Destined for Commerce, California**

16.     On February 22, 2024, DEA St Louis agents interdicted a UPS parcel which had originated from Detroit, Michigan, destined for "James Perez Woods, 2041 Davie Ave, Commerce, CA 90040-1704," with a return address of "EDD Shipping Department, 6541 E

Washington Blvd, Commerce, CA 90040." The UPS label had the same characteristics[1] of the preprinted labels believed to be utilized to send drug proceeds back to the DTO at addresses in Commerce, CA, which were located in the parcels discussed in Section A. Pursuant to a federal search warrant out of the Northern District of Illinois, agents located bundles of United States currency totaling $19,350 within the parcel. The currency had been heat sealed in plastic, wrapped in clear green plastic wrap and spray foamed into a secondary box within the parcel, indicative of drug proceeds.

17.     Additionally, on March 12, 2024, DEA agents in Los Angeles seized a UPS parcel which had originated from Landover, Maryland, destined for "James Perez Woods, 2142 S Tubeway Ave, Commerce, CA 90040," with a return address of "EDD Shipping Department, 6541 E Washington Blvd, Commerce, CA 90040." The UPS parcel again had the same characteristics of the preprinted labels, described in footnote 1, believed to be utilized to send drug proceeds back to the DTO at addresses in Commerce, CA, which were located in the parcels discussed in Section A. Pursuant to a California State search warrant, agents located bundles of United States currency totaling $50,000. The bundles were wrapped in clear plastic wrap and spray foamed into a secondary box within the parcel, again indicative of drug proceeds.

---

[1] The following characteristics are consistent with suspected cash parcels identified by investigators: a prepaid UPS label purchased through one of the three identified UPS shipper accounts (C4816C, 5W07W5 and 649516), prepaid postage weights of 10, 12 and 15 pounds, time between the postage purchase date and the origination scan exceeds 10 days, return address of EDD Shipping or Piccone Apparel with a shipper zip code of 90040, 90067 or 90026, a delivery address along HERNANDEZ's UPS delivery route in Commerce, California and the UPS origination scan is outside California. The origination scan is the first physical scan by UPS employees into the UPS system upon receipt of the parcel.

11

**D.    Arrest of Marvell LLOYD**

18.    On May 28, 2025, the investigation culminated in the issuance of arrest warrant, out of the Eastern District of Missouri, for LLOYD, and others, charging them by way of a multi-count, suppressed indictment with conspiracy to distribute and possess, with the intent to distribute, a mixture of substance containing a detectable amount of cocaine and conspiracy to commit money laundering under cause number 4:25CR286 HEA/PLC.

19.    On July 9, 2025, deputies with the U.S. Marshal Service, in conjunction with DEA, identified an apartment where LLOYD was staying, 17550 Collins Avenue, Sunny Isles Beach, Florida, apartment 1605. At approximately 1:20pm, LLOYD was located and taken into custody by deputies with the U.S. Marshal Service. At the time of his arrest, LLOYD was in possession of two cellular devices. **Device #1** (Black Apple iPhone with a clear case; Model # Unknown; FCC ID: Unknown; IC: Unknown; IMEI: Unknown). **Device #2** (Black Apple iPhone with no case; Model #Unknown; FCC ID: Unknown; IC: Unknown; IMEI: Unknown).

20.    Cooperating Person (CP-1)[2] advised that LLOYD began working for/with the MAJEAU DTO in 2022, distributing cocaine to DTO factions in Detroit, Michigan, St Louis, Missouri and Georgia. Prior to LLOYD working with the MAJEAU DTO, CP-1 advised that LLOYD would utilize flight attendants to transport narcotic shipments to DTO factions in Detroit, Michigan.

---

[2] Later in the investigation, investigators established Cooperating Person #1 (CP-1). CP-1 has no prior felony convictions and is offering their cooperation for potential future judicial consideration. The information provided by CP-1 has been corroborated and is believed to be reliable based upon law enforcement actions.

**E.    Tracking of Packages using Cellular Devices**

21.    UPS provides a service which allows you to track packages utilizing cellular telephones. Every time a cellular device tracks a package, UPS captures the devices IP address of the cellular service or WiFi the cellular device uses.[3] With finding multiple cellular telephones on LLOYD's person, I know from training and experience, narcotic traffickers will use multiple cellular telephones to thwart law enforcement from detecting their movements. Tracking multiple packages using different cellular devices will establish different IP addresses capture, instead of one device tracking packages containing narcotics. From this investigation, investigators have identified IP addresses associated with cellular devices that have tracked both seized and suspected drug parcels. Due to provider protocols and abilities, the information regarding which cellular device or wireless account used a specific IP address during a certain time could not be collected and in turn provided to investigators.

**F.    Training and Experience of the Investigative Team about the Use of Electronic Devices**

22.    During my career as a law enforcement officer, I have conducted numerous drug investigations including those of drug trafficking organizations. Based on my training and experience in such investigations, including electronic surveillance investigations, I and other members of the investigative team, know that drug traffickers communicate with each other utilizing cellular telephones and other electronic devices to facilitate the overall scheme of their

---

[3] For example, if a cellular device uses a WiFi network to track a package, then the IP address will come back to a residence. If the cellular device uses cellular service to track a package, then the IP address will come back to a phone number.

illicit endeavors. In order to be successful, drug traffickers must communicate via telephones or other electronic devices to orchestrate the importation of controlled substances; to manage and maintain contact with drug couriers; to maintain contact with lower-level distributors in their day-to-day operations; to maintain contact with safe house operators where narcotics are stored; and to coordinate the return movement of the drug derived profits back to the sources of supply.

23. Further based on my experience and training, I am cognizant that drug traffickers oftentimes "dump" or exchange their telephones and electronic devices for new telephonic instruments. Further insulating themselves from law enforcement detection, drug traffickers are known to subscribe to telephone and wireless communications and data services in other persons names and to frequently change their telephone number and or ESN's/IMSl numbers.

24. I also know from prior investigations and subsequent de-briefing of involved parties by investigative team members, that drug traffickers are known to compartmentalize the use of multiple electronic devices. As an example, a subject will use a certain electronic device to contact sources of supply, another electronic device to contact couriers, and other electronic devices to contact underlings, so forth and so on. Based on my training and experience and that of the investigative team, I know these measures are employed to thwart law enforcement's ability to detect members of a drug trafficking organization and conduct electronic surveillance on co-conspirators.

25. I also know based on my training and experience that individuals involved in the trafficking of narcotics use devices such as the **subject electronic devices** to facilitate their overall schemes and their illicit endeavors. In order to make it easier for drug currency and narcotics traffickers to communicate with one another, their phones and other devices often contain stored

14

telephone numbers, programmed names, addresses, and encrypted codes and names. I also know that the phones and other communication devices of currency and narcotics traffickers often contain voicemails, text messages, photographs and emails relating to communications with co-conspirators, meeting locations as well as the telephone numbers of co-conspirators who have called or been called by the device.

26.    Individuals engaged in the activities described in this affidavit use electronic devices and mobile phones like the **subject electronic devices** for a variety of reasons including:

      a.    accessing mapping and location services to assist in planning and facilitating their crimes, and to plan for their escape from crime scenes. Location data can indicate the user's patterns of behavior such as their physical location at the time the incidents occurred, and immediately prior to or after such incidents. It may also provide data related to the location of confederates residences, safe houses or other places used to perpetrate the crimes.

      b.    accessing contact lists of associates, confederates, and third parties;

      c.    Targets take pictures and videos of themselves and associates, to memorialize their activities and fruits of their illicit activities such as contraband, firearms, and illegally obtained currency. They use the images or to brag to other confederates. These individuals frequently maintain these photographs on their electronic devices and, as described below, often post the images on social media. With respect to firearms, I know that individuals engaged in the sale and trafficking of narcotics often carry firearms to protect themselves, their illicit product, and U.S. currency from theft, and based on my training and experience I know that they often keep

15

photographs of firearms used in furtherance of their drug trafficking activities stored on cellular phones;

d. criminals use the devices for online social media platforms such as Facebook, Twitter, Snapchat, etc. They communicate with their associates and confederates over such platforms. They post and display images and videos of contraband, fruits of their crimes, wealth, and otherwise memorialize criminal activities.

27.     In summary, electronic devices such as the **subject electronic devices** described herein and the services they provide are such a pervasive and insistent part of daily life that carrying one is indispensable to participation in modern society. Thus, there is reason to believe that LLOYD had, and used, the **subject electronic devices** in conjunction with the events described herein. The **subject electronic devices** themselves operate as instrumentalities of the crimes described herein.

### G.     What Can Be Recovered From Electronic Devices

28.     Based on my training and experience, I know that forensic examinations may be performed on electronic devices such as mobile phones tablets and, computers. Devices use internal fixed memory, SIM cards, or removable memory that stores the previously described information. It takes specialized training and experience along with software and hardware to perform forensic examinations and analysis of such devices and memory to retrieve this information. A forensic examiner may be able to recover evidence of the illegal activities described in this affidavit, including: user attribution, photographs, text messages, videos, phone and address books, call history, and geographical location data.

16

29.     Based on my knowledge, training, and experience, I know that electronic devices such as those identified in this affidavit can store information for long periods of time. I know that these devices contain files or remnants of files that can be recovered months or even years after they have been downloaded onto a storage medium, deleted, or viewed via the Internet. Electronic files downloaded to a storage medium can be stored for years at little or no cost. Even when files have been deleted, they can be recovered months or years later using forensic tools. Similarly, things that have been viewed via the Internet are typically stored for some period of time on the device

30.     Information that is electronically stored on the **subject electronic devices** serves as direct evidence of the crimes described in this warrant. Forensic analysis may demonstrate how the respective **subject electronic devices** were used, the purpose of their use, who used it, and when. There is probable cause to believe that such evidence will be on each of the respective **subject electronic devices**. Data on the **subject electronic devices** will likely also show who used or controlled that device for each of **subject electronic devices**. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence. Lastly, data on the **subject electronic devices** can show how the **subject electronic devices** were used as an instrumentality of the crimes.

31.     The **subject electronic devices** have remained in the lawful possession of law enforcement investigators**,** since their seizure as described above. Therefore, while investigators might already have all necessary authority to examine **subject electronic devices**, I seek this additional warrant out of an abundance of caution to be certain that an examination of **subject electronic devices** will comply with the Fourth Amendment and other applicable laws.

17

32.     In my training and experience, I know that **subject electronic devices** have been stored in a manner in which its contents are, to the extent material to this investigation, in substantially the same state as they were when **subject electronic devices** first came into the possession of law enforcement.

## H.    ELECTRONIC STORAGE AND FORENSIC ANALYSIS

33.     Based on my knowledge, training, and experience, I know that electronic devices can store information for long periods of time. Similarly, things that have been viewed via the Internet are typically stored for some period of time on the device. This information can sometimes be recovered with forensics tools.

34.     *Forensic evidence.* As further described in Attachment B, this application seeks permission to locate not only electronically stored information that might serve as direct evidence of the crimes described on the warrant, but also forensic evidence that establishes how the **subject electronic devices** were used, the purpose of their use, who used them, and when. There is probable cause to believe that this forensic electronic evidence might be on the **subject electronic devices** because:

> a.  Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file).
>
> b.  Forensic evidence on a device can also indicate who has used or controlled the device. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.

18

c.  A person with appropriate familiarity with how an electronic device works may, after examining this forensic evidence in its proper context, be able to draw conclusions about how electronic devices were used, the purpose of their use, who used them, and when.

d.  The process of identifying the exact electronically stored information on a storage medium that is necessary to draw an accurate conclusion is a dynamic process. Electronic evidence is not always data that can be merely reviewed by a review team and passed along to investigators. Whether data stored on a computer is evidence may depend on other information stored on the computer and the application of knowledge about how a computer behaves. Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

e.  Further, in finding evidence of how a device was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium.

f.  *Nature of examination.* Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant I am applying for would permit the examination of the **subject electronic devices** consistent with the warrant. The examination may require authorities to employ techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of the **subject electronic devices** to human inspection in order to determine whether it is evidence described by the warrant.

19

## CONCLUSION

35.    I submit that this affidavit supports probable cause for a search warrant authorizing the examination of the **subject electronic devices** described in Attachment A to seek the items described in Attachment B.

36.    Because this warrant seeks only permission to examine devices already in law enforcement's possession, the execution of this warrant does not involve the physical intrusion onto a premises. Consequently, I submit there is reasonable cause for the Court to authorize execution of the warrant at any time in the day or night.

37.    It is respectfully requested that this Court issue an order sealing, until further order of the Court, all papers submitted in support of this application, including the application and search warrant. I believe that sealing this document is necessary because the warrant is relevant to an ongoing investigation into the criminal organizations as not all of the targets of this investigation will be searched at this time. Based upon my training and experience, I have learned that, online criminals actively search for criminal affidavits and search warrants via the internet, and disseminate them to other online criminals as they deem appropriate, *i.e.*, post them publicly online through the carding forums. Premature disclosure of the contents of this affidavit and related documents may have a significant and negative impact on the continuing investigation and may severely jeopardize its effectiveness.

**I state under the penalty of perjury that the foregoing is true and correct,**

20

Respectfully submitted,

Jaclyn Casaceli
Special Agent
Drug Enforcement Administration

**Sworn to, attested to, or affirmed before me via reliable electronic means pursuant to Federal Rules of Criminal Procedure 4.1 and 41 on 30th  day of July, 2025**

SHIRLEY P. MENSAH
UNITED STATES MAGISTRATE JUDGE
Eastern District of Missouri

21

## ATTACHMENT A

**Device #1:**    Black Apple iPhone with a clear case; Model # Unknown; FCC

ID: Unknown; IC: Unknown; IMEI: Unknown, photographed below:



The **subject electronic device** is stored securely in the St. Louis Gateway Strike Force electronic evidence lockers located within the city of Maryland Heights, in the Eastern District of Missouri. It has not been examined or altered in any way since its seizure.

This warrant authorizes the forensic examination of the **subject electronic device** for the purpose of identifying the electronically stored information described in Attachment B.

## ATTACHMENT A

**Device #2:**     Black Apple iPhone with a no case; Model #Unknown; FCC ID:

Unknown; IC: Unknown; IMEI: Unknown, photographed below:



The **subject electronic device** is stored securely in the St. Louis Gateway Strike Force electronic evidence lockers located within the city of Maryland Heights, in the Eastern District of Missouri. It has not been examined or altered in any way since its seizure.

This warrant authorizes the forensic examination of the **subject electronic device** for the purpose of identifying the electronically stored information described in Attachment B.

2

## ATTACHMENT B

1.      All records on the Device described in Attachment A that relate to violations of Title 18, United States Code, Section 1956 and Title 21, United States Code, Sections 841(a) and 846 (the "subject offenses") involving Marvell LLOYD, including: dialed-call telephone numbers; received-call telephone numbers; missed-call telephone numbers; names, telephone numbers, addresses and other data located in the address books or contacts databases; photographs; voicemails; emails and text messages stored, and/or removable SIM cards, and/or removable data cards, and data stored, audio/video files;

2.      Evidence of user attribution showing who used or owned the **subject electronic devices** to be searched at the time the things described in this warrant were created, edited, or deleted, such as logs, phonebooks, saved usernames and passwords, documents, and browsing history;

3.      Records evidencing the use of the Internet to communicate via email, social media websites, or other electronic means, including:

   a. records of Internet Protocol addressed used;

   b. records of Internet activity, including firewall logs, caches, browser history and cookies, "bookmarked" or "favorite" web pages, search terms that the user entered into any Internet search engine, and records of user-typed web addresses;

4.      As used above, the terms "records" and "information" include all of the foregoing items of evidence in whatever form and by whatever means they may have been created or stored, including any form of computer or electronic storage (such as flash memory or other media that can store data) and any photographic form;

5.      All data files, including but not limited to, records and graphic representations, that is, documents and visual depictions of accounting records, websites, marketing, and facilitating records pertaining to the subject offenses;

6.      Graphic interchange formats and/or photographs, and other visual depictions of such Graphic Interchange formats (including, but not limited to, JPG, GIF, TIF, AVI and MPEG) containing matter pertaining to the subject offenses;

7.      Electronic mail, chat logs, Internet Relay Chat (IRC) log files and electronic messages pertaining to the subject offenses;

8.      Log files and other records concerning dates and times of connection to the Internet and to websites pertaining to the subject offenses; and

9.      Any Instant Message conversations, chats, e-mails, text messages, or letters pertaining to the subject offenses.

2